UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| Worldwide Digital Entertainment, LLC; Piracy Recovery, LLC, <br><br> Plaintiffs <br><br> v. <br><br> Woodstone Deli and Sports Grill; Michael McMurray d/b/a Krackerjack Karaoke; CONLEY'S OVERLOOK LLC; Ron Hutchins d/b/a Star Search Karaoke; BIGGIES TN LLC; Joshua Fields d/b/a Nite Life Karaoke; HULSING HOTELS TENNESSEE, INC.; Emma Cole d/b/a Karaoke Klub and/or d/b/a Karaoke With Emma; QUALITY RESTAURANT CONCEPTS, LLC; Bob Eaton d/b/a Night Train karaoke; Neil McMurray d/b/a Just 4 Kix Karaoke; SCULLY'S BAR & GRILL INC.; Todd Dolehanty; Jeffery D's Sports N' Cigar Bar; Numan's Cafe & Sports Bar; MELLOW MUSHROOM OF JOHNSON CITY, LLC, KINGSPORT LODGE NO. 972, LOYAL ORDER OF MOOSE; HACKLER-WOOD POST NO. 145, INCORPORATED; Mike Butler d/b/a Paradise Productions and Entertainment; John Does 1 - 10; John Does, Inc. 1-10; and John Does, LLC 1-10, <br><br> Defendants. | No. _____ <br><br> *Jury Trial Requested* |

## COMPLAINT

Plaintiffs Worldwide Digital Entertainment, LLC; and Piracy Recovery, LLC (hereinafter referred to collectively at times as, "Plaintiffs"), for their complaint against Defendants

Woodstone Deli and Sports Grill; Michael McMurray d/b/a Krackerjack Karaoke; Conley's Overlook LLC; Ron Hutchins d/b/a Star Search Karaoke; Biggies TN LLC; Joshua Fields d/b/a Nite Life Karaoke; Hulsing Hotels Tennessee, Inc.; Emma Cole d/b/a Karaoke Klub and/or d/b/a Karaoke With Emma; Quality Restaurant Concepts, LLC; Bob Eaton d/b/a Night Train karaoke; Neil McMurray d/b/a Just 4 Kix Karaoke; Scully's Bar & Grill Inc.; Todd Dolehanty; Jeffery D's Sports N' Cigar Bar; Numan's Cafe & Sports Bar; Mellow Mushroom of Johnson City, LLC ; Kingsport Lodge No. 972, Loyal Order of Moose; Hackler-Wood Post No. 145, Incorporated; Mike Butler d/b/a Paradise Productions and Entertainment; John Does 1 - 10; John Does, Inc. 1-10; and John Does, LLC 1-10 (hereinafter referred to collectively at times as, "Defendants"), allege as follows:

## Jurisdiction

1. This action arises pursuant to the Copyright Laws of the United States, 17 U.S.C. §§ 101-1332; the Lanham Act, 15 U.S.C. § 1051 *et al.*; and the common law.

2. This Court has original jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1338(a).

3. This Court has personal jurisdiction over each of the Defendants because, inter alia, each of the Defendants are persons or business entities which, on information and belief, have committed acts of copyright infringement, trademark infringement, and/or other related acts in this district including the cities of Johnson City, Elizabethton, and/or Kingsport.

4. Venue is proper in this district pursuant to at least 28 U.S.C. §§ 1391(a), (b) and (c) and 1400(a).

## The Parties

5. Plaintiff Worldwide Digital Entertainment, LLC is a Wyoming limited liability company with a principal place of business at 10840 Chapman Hwy, Seymour, Tennessee 37865.

6. Plaintiff Piracy Recovery, LLC is a Wyoming limited liability company with a principal place of business at 10840 Chapman Hwy, Seymour, Tennessee 37865.

7. Upon information and belief, Defendant Woodstone Deli and Sports Grill ("Woodstone Deli") is an individual of unknown identity doing business as Woodstone Deli and Sports Grill, a partnership of unknown identities doing business as Woodstone Deli and Sports Grill, or a formal business entity of unknown type that operates as an eating and drinking establishment in the Kingsport area under the name Woodstone Deli and Sports Grill, and is located at 3500 Fort Henry Drive, Kingsport, Tennessee 37664.

8. Upon information and belief, Defendant Michael McMurray is an individual residing 1907 Park St., Kingsport, Tennessee 37664, who operates a karaoke and disc jockey service under the trade name "Krackerjack Karaoke".

9. Upon information and belief, Defendant Conley's Overlook LLC ("Conley's"), is a Tennessee limited liability company with a principal place of business at 112 Tory Lane, Kingsport, Tennessee 37660 that operates an eating and drinking establishment in the Kingsport area under the name "Conley's Overlook Dam Bar."

10. Upon information and belief, Defendant Ronald Hutchins is an individual residing 1608 Highpoint Ave., Kingsport, Tennessee 37665, who operates a karaoke and disc jockey service under the trade name "Star Search Karaoke".

11. Upon information and belief, Defendant Biggies TN LLC is a Tennessee limited liability company with a principal place of business at 417 W Stone Drive, Kingsport, Tennessee 37660 that operates an eating and drinking establishment in the Kingsport area under the name

"Biggie's Clam Bar."

12. Upon information and belief, Defendant Joshua Fields is an individual residing 1725 Jefferson Ave., Kingsport, Tennessee 37664, who operates a karaoke and disc jockey service under the trade name "Nite Life Karaoke" and/or "Karaoke with Josh and Heather."

13. Upon information and belief, Defendant Hulsing Hotels Tennessee, Inc. is a corporation of Tennessee that operates a Holiday Inn hotel located in the Johnson City area with an address of 101 Springbrook Dr., Johnson City, Tennessee 37604.

14. Upon information and belief, Defendant Emma Cole is an individual residing at 1403 Charity Hill Rd., Elizabethton, Tennessee 37643, who operates a karaoke and disc jockey service under the trade name "Karaoke Klub" and/or "Karaoke With Emma."

15. Upon information and belief, Defendant Quality Restaurant Concepts, LLC is an Alabama limited liability company with a principal business address at 601 Vestavia Parkway, Suite 1000, Vestavia, Alabama 35216, that operates at least two eating and drinking establishment in Tennessee, each under the name "Applebee's", with a location at 1010 Over Mountain Dr. Elizabethton, Tennessee 37643 and 425 Volunteer Parkway Bristol, Tennessee 37620.

16. Upon information and belief, Defendant Bob Eaton is an individual residing at 214 Douglas Chapel Rd., Jonesborough, Tennessee 37659, who operates a karaoke and disc jockey service under the trade name "Night Train Karaoke".

17. Upon information and belief, Defendant Neil McMurray is an individual residing at 1603 Lynn Garden Dr., Kingsport, Tennessee 37665, who operates a karaoke and disc jockey service under the trade name "Just 4 Kix Karaoke".

18. Upon information and belief, Defendant Scully's Bar & Grill Inc. is a corporation of Tennessee with a principal place of business at 3103 N Roan St., Johnson City, Tennessee 37601 that operates an eating and drinking establishment under the same name.

19. Upon information and belief, Defendant Todd Dolehanty is an individual residing 1309 Holly Ct., Bristol, Tennessee 37620, who operates a karaoke and disc jockey service under his own name.

20. Upon information and belief, Defendant Jeffery D's Sports N' Cigar Bar is an individual (Jeffrey D. Bledsoe) doing business as Jeffery D's Sports N' Cigar Bar, a partnership including Jeffrey D. Bledsoe doing business as Jeffery D's Sports N' Cigar Bar, or formal business entity of unknown type that operates as an eating and drinking establishment in the Bristol area under the same name with an address at 1403 Bluff City Hwy., Bristol, Tennessee 37620.

21. Upon information and belief, Defendant Numan's Cafe & Sports Bar is an individual of unknown identity doing business as Numan's Cafe & Sports Bar, a partnership of unknown identities doing business as Numan's Cafe & Sports Bar, or a formal business entity of unknown type that operates an eating and drinking establishment in the Johnson City area under the same name with an address at 225 E. Main St., Johnson City, Tennessee 37604.

22. Upon information and belief, Defendant Mellow Mushroom of Johnson City, LLC is a Tennessee limited liability company with a principal place of business at 2929 N Roan St., Johnson City, Tennessee 37601 that operates an eating and drinking establishment under the name "Mellow Mushroom."

23. Upon information and belief, Defendant Kingsport Lodge No. 972, Loyal Order of Moose is a non-profit corporation of Tennessee having a business address at 301 East Main Street, Kingsport, Tennessee.

24. Upon information and belief, Defendant Hackler-Wood Post No. 145, Incorporated is a corporation of Tennessee ("inactive status") having a business address at 515 Marion Ave., Bristol, Tennessee 37620.

25. Upon information and belief, Defendant Mike Butler is an individual operating a website at the domain name http://www.paradiseproductions-entertainment.com and residing at

5

332 R. Miller Rd., Piney Flats, Tennessee 37686, who operates a karaoke and disc jockey service under the name Paradise Productions and Entertainment.

## Background Facts

### A. *The Karaoke Recordings*

26. Karaoke is a type of entertainment, based on re-recordings of popular songs, where singers follow the lyrics to those songs on a video screen and substitute their own voice(s) for those of the lead vocalist. Typically, the lead vocal tracks of these re- recordings for karaoke use are omitted, so the karaoke performer can sing along as though he or she were the lead singer.

27. The karaoke recordings also include graphics, which provide a contemporaneous video display of the lyrics of the song in order to assist the performer. Said lyrical graphics are created specifically for this purpose by the Plaintiffs. Karaoke "compact disc plus graphics" ("CD+G") recordings contain re-created arrangements of popular songs, performed by professional studio musicians hired by Plaintiffs specifically for this purpose, and incorporating the contemporaneous video display.

28. For all karaoke produced by the Plaintiffs, the graphics data has also been utilized to display the Chartbuster trademarks and/or trade dress described below.

29. Recording copyrighted material for the purposes of creating and producing a karaoke recording generally requires a license for exploitation of the song, which must be obtained from the songwriter or their agent, generally called a "music publisher." Plaintiffs have spent millions of dollars in securing these rights, and paying statutory and negotiated royalties to the owners of copyrights in the underlying musical works for their activities in legitimately recording, distributing, and selling karaoke recordings in CD+G and/or other formats.

30. The Plaintiffs have spent millions of dollars obtaining rights to recreate these songs from the publishers that hold such rights, building and maintaining studios, hiring artists,

building a distribution facility, paying royalties to the songwriter(s), publishers and other copyright owners, building a company that is capable of reliably producing high-quality karaoke versions of current and historical musical hits, and building a brand that is one of the pre-eminent brands in the industry.

31. Building a large and popular catalog of karaoke recordings, fully licensed for exploitation and re-created using the highest standards, has been the hallmark of the Plaintiffs' business.

32. The re-recorded music is a "sound recording" unique to the producer of such works. The contemporaneous video display is likewise a creative work unique to the producer of the karaoke recording.

33. The final product by the Plaintiffs is a unique work protected under the copyright laws of the United States, and Plaintiffs have obtained copyright and trademark registrations for their products.

### B. Venues and Karaoke Entertainers

34. The defendant restaurants and bars utilize karaoke as a means to attract customers to their establishments. That is, they do not "sell" karaoke; rather, they provide karaoke as a form of promotion and advertisement, intended to increase patronage, such that these defendants can sell more food and/or drink.

35. Entertainers who provide karaoke services in bars, restaurants and other venues are known as karaoke jockeys ("KJs"). Individual Defendants Michael McMurray d/b/a Krackerjack Karaoke; Ron Hutchins d/b/a Star Search Karaoke; Josh Fields d/b/a Nite Life Karaoke; Emma Cole d/b/a Karaoke Klub and/or d/b/a Karaoke With Emma; Bob Eaton d/b/a Night Train karaoke; Neil McMurray d/b/a Just 4 Kix Karaoke; and Todd Dolehanty work as KJs in east Tennessee. Such entertainers may be employed directly by the venue, or may be hired from outside the venue, and are engaged specifically for the purpose of entertaining patrons, attracting new business, and increasing revenues.

36. The services provided by KJs typically include providing the karaoke music and equipment for playback, entertaining the assembled crowd for warm-up purposes, and organizing the karaoke show by controlling access to the stage, setting the order of performance, and operating the karaoke equipment in order to play the karaoke works for the patrons.

37. The KJ will accept song requests from the patrons of the participating venue who wish to perform, and then provide a public playing of the karaoke work(s) corresponding to those requests for each singer. The singer will publicly perform the requested work for the entertainment of themselves and the venue's patrons.

38. Typically, the business and/or KJ will maintain a catalog of songs available for performance in order to aid participants in selecting a song to sing.

39. In recent years, computer technology, cheap file memory devices, and the Internet have made it possible for karaoke CD+G discs to be decoded and copied ("ripped") and subsequently stored to a computer hard drive or other digital memory device.

40. Computer software technology has developed the means for individuals to compile and distribute large catalogs of entertainment content, including karaoke works. Such software can make a single "ripped" karaoke file of the instantly available to literally millions of individuals throughout the world, connected through the Internet. Likewise, operators of such software will have easy and free access to the compiled libraries of other individuals who have ripped the karaoke works, in essence creating a free pool of virtually every karaoke work ever recorded.

41. Once a karaoke recording has been "ripped" in this fashion, it then becomes simple to utilize, share, and/or distribute the karaoke work. Such technology has enabled individuals to use and share karaoke works, such as those created by the Plaintiffs, without recompense, and in violation of the copyrights and trademarks held by the Plaintiffs.

42. Karaoke recordings that have been obtained in this fashion are typically referred to in the music industry as "pirated" works.

### C. Piracy and the Karaoke Industry

43. The aforementioned technology has proven irresistible to some KJs and businesses offering karaoke, many of whom have used this opportunity to copy a single purchased disc to several different computer based systems, copy a participant's personal discs if they use them during a show, "swap" song files among each other, download them from illegal file-sharing sites, build libraries of tens of thousands of karaoke songs without paying for them, and purchase and/or sell computer memory devices containing vast catalogs of protected karaoke works without proper compensation to the rights holders.

44. Whereas in the past a KJ or business would buy multiple copies of an original CD+G, now many simply illegally "clone" their songs for multiple commercial systems or even their entire karaoke song libraries to start a new operation, including illegally downloading Plaintiffs' copyrighted works from pirate websites. Additionally, many KJs or operators starting in the business simply buy computer drives pre-loaded with thousands of illegally copied songs.

45. These practices have become so widespread that the owner of the Chartbuster brand is literally fighting for its survival. Despite the fact that karaoke is more popular than ever, Chartbuster brand revenue is less than half what it was in 2004. In fact, the piracy complained of herein threatens the entire karaoke industry.

46. For KJs and karaoke operators, karaoke is a commercial enterprise. Those who legitimately acquired all of their music at great cost are being forced by illicit competition to produce shows for lower and lower fees. Illegitimate competitors offer libraries of tens of thousands of songs, and produce shows for significantly lower rates than a legitimate KJ or karaoke operator can offer. The result is significant financial pressure on once legitimate operators to skirt or ignore the law and become pirates, simply to stay in business.

47. As illustrated by the exemplary infringements of Plaintiffs' copyrighted works on Exhibit A, Defendants have taken full advantage of this situation by using pirated karaoke in

their businesses.

48. Plaintiffs have been forced to undertake this litigation in order to ensure that they survive and continue to produce the high-quality karaoke music karaoke fans demand, and to level the playing field for the legitimate karaoke operators.

49. Like other KJs and karaoke operators, Defendants have obtained, copied, shared, distributed and/or sold unauthorized digitized copies of the Plaintiffs' copyrighted karaoke recordings via pre-loaded hard drives, USB drives, CD-R's, other digital storage media, or the Internet, and, upon information and belief, continue to do so.

50. The copying, sharing, distribution, and selling of these illegal digitized copies was not accompanied by the payment of any royalty to the Plaintiffs, nor authorized by any license agreement.

51. Those persons, including the Defendants, who illegitimately obtain, copy, share, distribute, and/or sell digitized copies of the Plaintiffs' karaoke discs do not pay royalties to Plaintiffs or the owners of copyrights in the underlying musical works.

52. The widespread creation of counterfeit copies of the Plaintiffs' karaoke discs in CD+G and other formats has denied the Plaintiffs the benefit of their investments.

53. These counterfeits include Chartbuster's registered trademarks, such that to the consumers of the illegitimate KJs' services, the counterfeits are indistinguishable from genuine Chartbuster materials.

54. For each of the several recent releases of new karaoke music by Chartbuster, multiple illegitimate copies of the contents of CD+G were created, on average, for each legitimate copy sold. Chartbuster has lost a considerable amount of money due to this widespread piracy.

55. Such widespread piracy of music has been made possible by improving ever-cheaper computer technology and memory devices, and the easy distribution of digital content

over the Internet.

56. Widespread pirating of songs has contributed to the loss of more than sixty jobs at Plaintiffs' headquarters in Seymour, TN and several consecutive years of operating losses as revenues do not cover fixed costs.

57. In fact, the initial rights holders of the copyright catalog and trademark rights which have been assigned to Plaintiffs were driven into bankruptcy by these practices.

58. Legitimate KJs and venues that operate legal karaoke shows spend thousands of dollars acquiring the Plaintiffs' karaoke music, an irreducible overhead cost that must be recovered over a significant number of engagements.

59. Illegitimate KJs and venues who operate illegal karaoke shows, who acquire the songs in their libraries illegally, have an unfair advantage over their legitimate competitors, because the illegitimate KJs and venues who operate illegal karaoke shows are able to provide karaoke services with a considerably lower overhead cost and significantly more songs through the pirating of the Plaintiffs' music.

60. Piracy therefore unfairly increases the profits of illegitimate KJs and karaoke venues, and unfairly decreases the profits of legitimate KJs and karaoke venues, a condition that pressures legitimate KJs to either commit piracy instead of doing business with the Plaintiffs and other karaoke music producers or lose their shows to KJs offering more songs at cheaper prices to the same venues.

61. Because of piracy, it is nearly impossible for legitimate businesses to compete against illegal KJs and karaoke venues, which are able to provide less expensive karaoke services and a greater number of songs due to their lower overhead costs.

**Rights of the Plaintiffs**

A. *Copyrighted Works*

62. Worldwide Digital Entertainment, LLC's registered copyrights for karaoke songs include those set forth on Exhibit A, which were illegally infringed by Defendants.

63. Plaintiffs have provided the public, including the Defendants, with notice of their copyrights through the display of the symbol © and "circle p" on each CD+G karaoke product distributed. In addition, the graphics portion of each karaoke track on all CD's produced by Plaintiffs displays the © and "circle p".

### B. Trademark Rights

64. Plaintiff Piracy Recovery, LLC is the owner of U.S. Trademark Registration No. 3657553 for the trademark CHARTBUSTER KARAOKE.

65. Piracy Recovery, LLC is also the owner of U.S. Trademark Registration No. 3660592 for the following trademark (collectively, hereinafter, the "Chartbuster Marks"):



66. Plaintiffs are both beneficiaries of the business goodwill associated with these marks, in that sales of karaoke discs by Worldwide Digital Entertainment, LLC, its predecessor(s) and/or its licensee(s) under the Chartbuster trademarks inures to the benefit of all

Plaintiffs.

67. The yellow and red logo is distinctive and well recognized to karaoke patrons.

68. Plaintiffs have, for the entire time these marks have been federally registered, provided the public, including the Defendants, with notice of these federal trademark registrations through the consistent display of the symbol ® with its registered marks as used.

69. Plaintiffs have further incorporated distinctive design and packaging of the graphics portion of its karaoke, which identifies the product with Plaintiffs and/or their predecessors.

70. Specifically, the graphics of all Chartbuster brand karaoke are in unique yellow lettering on a distinctive blue background. No other karaoke music producer uses similar colors.

71. In fact, in requesting a particular Chartbuster version of a song, karaoke performers will often ask for the "yellow and blue" one - or the one with the "yellow and red" logo. These karaoke performers and KJs alike understand and associate the "yellow and blue" with Chartbuster brand karaoke, and only Chartbuster brand karaoke.

72. Chartbuster brand graphics are also set in a distinctive typeface, Arial Unicode MS, which, upon information and belief, no other karaoke manufacture uses in its graphics.

### Defendants' Culpability

73. On the dates set forth in Exhibit A, karaoke performers sang an unauthorized counterfeit copy of at least one copyrighted song bearing a Chartbuster trademark at the businesses of each Defendant.

74. Upon information and belief, the infringements by each of the Defendants of the Plaintiffs' copyrights and trademarks are a regular act that has been repeated numerous times over a period of months or years and are not isolated or transient occurrences.

75. Because the duplication activities were not undertaken with the Plaintiffs'

13

knowledge or authorization, the Plaintiffs were unable to control the quality of the infringing songs.

76. In most if not all cases, the infringing songs are degraded from the original quality, such that the high quality of the Plaintiffs' non-infringing songs is no longer the same as it was when original media are used.

77. Each of the Defendants realized substantial revenues and profits from the sale of food and drink to patrons during the performance of karaoke shows at which infringing karaoke tracks were used and counterfeits of the Chartbuster Marks were displayed.

78. None of the Defendants or other persons paid any royalties or fees to the Plaintiffs or to other upstream owners of copyright in the underlying musical works for the privilege of conducting their duplication and use of those works.

79. None of the Defendants or other persons paid any royalties or fees to the Plaintiffs for the privilege of displaying the Chartbuster Marks during the karaoke shows.

80. All infringing karaoke was performed by Defendant venues' employees or other persons whom those Defendants had the right and ability to supervise and control.

81. Moreover, because of increased sales, gross profits and net profits, the Defendant venues each had a financial interest in permitting the infringing karaoke to be played and performed in their businesses.

82. Accordingly, Defendant venues are vicariously liable for the copyright and trademark infringement complained of herein, even if they did not own, possess or play the infringing karaoke.

83. The Plaintiffs and/or their predecessors have offered each of the Defendants the opportunity to enter into a Verified Compliance Safe Harbor Program, a program that protects venues from liability for the acts of their KJs in exchange for requiring their KJs to provide information about their karaoke systems to enable the Plaintiffs to assess whether those KJs are

14

operating legally.

84. The Plaintiffs have also provided a certification program to KJs as a means by which venues can determine, without significant inquiry, whether the KJs they wish to hire are using authentic materials or not.

85. As a result of the Plaintiffs' efforts, Defendant venues had actual or constructive knowledge of the infringing activities and through their payments to KJs (including but not limited to the Defendants KJs) induced, caused and/or materially contributed to the infringement such that the Defendants are liable as contributory infringers.

86. Plaintiffs reserve the right to add additional persons as defendants as new facts emerge.

87. The infringements alleged herein were willful.

88. Specifically, all businesses in this area offering karaoke at their establishments became aware of the problem of pirated karaoke as a result of other similar lawsuits filed in this District including, for example, *Slep-Tone Entertainment Corporation, et al. v. Jimmy's Southern Pub, LLC,* No: 2009-cv-436 and *Worldwide Digital Entertainment, LLC et al. v. Jimmy's Southern Pub, LLC et al.,* No: 3:11-cv-36 which recently settled out of Court in April 2013.

89. The acts attributable to the Defendants are of a commercial nature, in that the acts were principally motivated by the transfer of money by, between, and among the various participants in the karaoke shows in connection with the services being provided.

### Count I – Claim for Copyright Infringement

90. Plaintiffs re-allege each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporate them herein by reference.

91. Each of the Defendants willfully infringed Plaintiffs' copyrights, by using a

15

reproduction, counterfeit, or copy of works for which Plaintiffs own copyrights, including but not limited to those works set forth on Exhibit A.

92. By virtue of its copyrights, Plaintiffs have exclusive rights to reproduce, sell and distribute the copyrighted recordings, or to authorize others to do so.

93. Plaintiffs did not license or otherwise grant rights to any of the Defendants to use the copyrighted works in their businesses; nor did Plaintiffs license the KJs employed or otherwise hired by Defendants.

94. Defendants are directly and vicariously liable for these copyright infringements.

95. Alternatively, Defendants are contributorily liable for these copyright infringements.

96. The Defendants' unlawful infringement of Plaintiffs' copyrights has financially benefited Defendants and financially damaged Plaintiffs.

## Count II – Trademark Infringement

97. Plaintiffs re-allege each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporate them herein by reference.

98. Each of the Defendants willfully infringed Plaintiffs' trademarks by using a reproduction, counterfeit, or copy of the Chartbuster Marks in connection with the provision of services including karaoke services, by displaying the reproduction, counterfeit, or copy of the Chartbuster Marks during the provision of those services.

99. The Defendants' use of the Chartbuster Marks was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

100. Plaintiffs did not license any of the Defendants to use the Chartbuster Marks in connection with the provision of those services.

101. The Defendants' use of the Chartbuster Marks is and was likely to cause confusion, or to cause mistake, or to deceive the Defendants' customers and patrons into believing that the Defendants' services are and were being provided with the authorization of the Plaintiffs.

102. Defendants are directly and vicariously liable for these trademark infringements.

103. Alternatively, Defendants are contributorily liable for these trademark infringements.

### Count III – Unfair Competition

104. Plaintiffs re-allege each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporate them herein by reference.

105. On each occasion when Defendants caused a Chartbuster song to be played during a karaoke show, the Defendants displayed the Chartbuster Marks in connection with the Defendants' karaoke services.

106. The display of the Chartbuster Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the Plaintiffs sponsored or approved the Defendants' services and commercial activities.

107. The display of the Chartbuster Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Plaintiffs and legally purchased by the Defendants.

108. The Defendants' use of the Chartbuster Marks in this fashion would have inured to the benefit of the Plaintiffs if the Defendants had legitimately acquired genuine Chartbuster brand discs instead of counterfeiting them or acquiring counterfeit copies, in that each of the Plaintiffs would have received revenue from such sales and the quality of the original discs

17

would have been high (versus the diminished quality of copies).

109. Because the Plaintiffs have been denied this revenue, they have each been damaged by the Defendants' uses.

**Prayer for Relief**

WHEREFORE, Plaintiffs pray for judgment against each of the Defendants severally and that the Court:

A. Find and decree that each of the Defendants has willfully and intentionally infringed upon the copyrights of Plaintiffs;

B. Award Plaintiffs damages for copyright infringement based upon Defendants' profits or statutory damages as elected by Plaintiffs, to the fullest extent allowed by law;

C. Plaintiffs seek damages measured by Defendants' profits or statutory damages for willful infringement, and not more than ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000) per work infringed under 17 U.S.C. § 504(c)(2) for copyright infringement from each Defendant;

D. Find and decree that each of the Defendants has willfully and intentionally infringed upon the trademarks of Plaintiff;

E. Award Plaintiffs damages for trademark infringement based upon Plaintiffs' actual damages and Defendants' profits or statutory damages as elected by Plaintiffs, to the fullest extent allowed by law, and not more than TWO MILLION DOLLARS ($2,000,000) per counterfeit mark under 15 U.S.C. §1117(c)(2) for trademark infringement from each Defendant;

F. Find and decree that each of the Defendants has engaged in unfair competition against each of the Plaintiffs in violation of 15 U.S.C. §1125(a).

G. Award Plaintiffs damages against Defendants for such unfair competition to the fullest extend allowed by law;

18

Case 2:13-cv-00136-RLJ-MCLC   Document 1   Filed 05/17/13   Page 18 of 20   PageID #: 18

H. Award Plaintiffs punitive and treble damages, or otherwise enhanced damages, as available under applicable law;

I. Find that each of the Defendants, by virtue of its knowledge, ability to control, and benefit from acts of infringement of the federally registered Chartbuster Marks, directly committed by their contractors, is vicariously or otherwise indirectly and derivatively liable for those acts;

J. Grant Plaintiffs preliminary and permanent injunctive relief against further infringement of the Chartbuster Marks by the Defendants;

K. Grant Plaintiffs preliminary and permanent injunctive relief against further false designations of origin by the Defendants with respect to words, names, and symbols associated with other manufacturers;

L. Order the seizure of all computer disks, drives, or other media belonging to or in the possession of any of the Defendants, which media contain illegal reproductions of copyrighted material or counterfeits of registered trademarks;

M. Award Plaintiffs their attorneys' fees and costs; and

N. Grant Plaintiffs such further additional relief to which they may be entitled.

## Request for Jury Trial

Plaintiffs hereby request a jury to try any issue triable of right before a jury.

Respectfully submitted,

By: /s/ Michael E. Robinson
Michael E. Robinson, BPR #24681
Matthew M. Googe, BPR #30164
Michael J. Bradford, BPR #22689
Luedeka Neely Group, P.C.
P.O. Box 1871
1871 Riverview Tower
Knoxville, TN 37901
Phone: (865) 546-4305
Fax: (865) 523-4478
RRobinson@Luedeka.com
MGooge@Luedeka.com
MBradford@Luedeka.com

ATTORNEYS FOR PLAINTIFFS